JOHN WAGNER ASSOCIATES, d/b/a
Grabber Utah, Plaintiff and
Appellant,

v.

HERCULES, INC., Modulaire Industries,
Inc., and John Does I–X, Defendants
and Appellees.

No. 890017–CA.

Court of Appeals of Utah.

Aug. 31, 1990.

Rehearing Granted Nov. 6, 1990.

Darrel J. Bostwick and Robert F. Babcock, Walstad & Babcock, P.C., Salt Lake City, for plaintiff and appellant.

James M. Elegante, Mark S. Webber, Parsons, Behle & Latimer, Salt Lake City, for defendants and appellees.

## OPINION

Before BENCH, DAVIDSON and ORME, JJ.

BENCH, Judge:

Plaintiff, John Wagner Associates, d/b/a Grabber Utah (Wagner), appeals the dismissal of its complaint against defendant Hercules, Inc. (Hercules). Wagner sought to recover compensation for construction materials supplied by Wagner for two modular buildings constructed on behalf of Hercules. We reverse and remand.

Hercules has an award/contract to build missiles for the United States Navy at its Bacchus Works plant. The plant is located on land owned by the federal government and controlled by the Navy. In order to obtain additional office facilities at the site, Hercules leased two modular office complexes from Modulaire Industries, Inc. (Modulaire). The lease, which was entered into in June 1985 for a term of two years, included an option to renew and an option to buy. Modulaire transported thirty modular units measuring fourteen feet by sixty feet to the plant site and assembled the units together to form the shells of two sizable buildings.

Modulaire subcontracted with Space Building Systems (SBS) to provide labor and materials to finish the 25,000 square feet of office space inside the buildings. Wagner supplied drywall and other construction materials to SBS for the interior finishing. After the interior work was completed, SBS owed Wagner a balance of $14,300.03 for supplies and materials. Before Wagner was able to collect the outstanding balance, however, SBS filed for bankruptcy. Demand by Wagner for payment from Modulaire and Hercules was unsuccessful.

Wagner filed a notice of mechanic's lien against the property with the Salt Lake County Recorder, pursuant to the provisions of Utah Code Ann. §§ 38–1–1 et seq. (1988) (hereafter, the Mechanic's Lien Statute), and subsequently filed this action to foreclose on the lien. A cause of action was also asserted against Hercules for failure to obtain a payment bond as required by Utah Code Ann. §§ 14–2–1 et seq. (1986) (hereafter, the Payment Bond Statute).[1]

The trial court dismissed Wagner's foreclosure action on summary judgment, ruling that no mechanic's lien was available because Hercules's interest in the land was inalienable. The payment bond cause of action went to trial. Following a bench trial on the payment bond claim, the trial court found in favor of Hercules on the ground that Hercules's leasing of the office units did not "constitute the construction, addition to, alteration or repair of a building, structure, or improvement upon the land."

Wagner appeals, seeking reversal of the summary judgment and reinstatement of

---

1. A third cause of action was asserted against Modulaire for breach of an agreement to issue joint checks payable to both SBS and Wagner. Wagner and Modulaire, however, settled prior to trial and Modulaire is not a party to this appeal.

its foreclosure action. Wagner also seeks reversal of the final judgment on its payment bond cause of action and remand to the trial court for determination of damages under the Payment Bond Statute.

We are asked to interpret two similar statutes: (1) the Payment Bond Statute which requires an owner to obtain from the contractor a payment bond prior to the construction of a building in order to guarantee that materialmen and laborers will be paid;[2] and (2) the Mechanic's Lien Statute which creates a lien against the improved property in favor of the contractors, subcontractors, and materialmen.[3]

"When uncertainty exists as to the interpretation and application of a statute, it is appropriate to look to its purpose in the light of its background and history, and also to the effect it will have in practical application." *Stanton Transportation Co.* *v. Davis*, 9 Utah 2d 184, 187, 341 P.2d 207, 209 (1959). "[T]hese statutes should be interpreted and applied in such a manner as to carry out the purpose for which they were created: to protect those who supply labor and materials." *King Bros., Inc. v. Utah Dry Kiln Company*, 21 Utah 2d 43, 45, 440 P.2d 17, 18 (1968) (referring to Payment Bond Statute). *See also Interiors Contracting, Inc. v. Navalco*, 648 P.2d 1382, 1386 (Utah 1982) (Mechanic's Lien Statute to be construed broadly to protect materialmen and laborers).

The aim and purpose of our mechanic's lien law manifestly has been to protect, at all hazards, those who perform the labor and furnish the materials which enter into the construction of a building or other improvement. *The result has been that the owner of the premises, at*

---

2. The Payment Bond Statute provides in relevant part:
   14–2–1   Bond to protect mechanics and materialmen.
   The owner of any interest in land entering into a contract, involving $2,000 or more, for the construction, addition to, alteration, or repair of any building, structure, or improvement upon land shall, before any such work is commenced, obtain from the contractor a bond in a sum equal to the contract price, with good and sufficient sureties, conditioned for the faithful performance of the contract and prompt payment for material furnished, equipment and materials rented, and labor performed under the contract. This bond runs to the owner and to all other persons as their interest may appear. Any person who has furnished or rented any equipment or materials, or performed labor for or upon any such building, structure, or improvement, for which payment has not been made, has a direct right of action against the sureties upon such bond for the reasonable value of the rented materials or equipment furnished, for the reasonable value of the materials furnished, or for labor performed, not exceeding the prices agreed upon. This right of action accrues 40 days after the completion, abandonment, or default in the performance of the work provided for in the contract.
   This bond shall be exhibited to any person interested, upon request.
   14–2–2   Failure to require Bond—Direct liability—Limitations of actions.
   Any person subject to the provisions of this chapter, who shall fail to obtain such good and sufficient bond, or to exhibit the same, as herein required, shall be personally liable to all persons who have furnished materials or performed labor under the contract for the reasonable value of such materials furnished or labor performed, not exceeding, however, in any case the prices agreed upon. Actions to recover on such liability shall be commenced within one year from the last date the last materials were furnished or the labor performed.
   Section 14–2–1 was amended in 1987 and in 1989. 1987 Utah Laws 218; 1989 Utah Laws 271; *see also* Utah Code Ann. § 14–2–1 (Supp. 1990).

3. The Mechanic's Lien Statute provides in relevant part:
   38–1–3   Those entitled to lien—What may be attached.
   Contractors, subcontractors, and all persons performing any services or furnishing or renting any materials or equipment used in the construction, alteration, or improvement of any building or structure or improvement to any premises in any manner and licensed architects and engineers and artisans who have furnished designs, plats, plans, maps, specifications, drawings, estimates of cost, surveys or superintendence, or who have rendered other like professional service, or bestowed labor, shall have a lien upon the property upon or concerning which they have rendered service, performed labor, or furnished or rented materials or equipment for the value of the service rendered, labor performed, or materials or equipment furnished or rented by each respectively, whether at the instance of the owner or of any other person acting by his authority as agent, contractor, or otherwise. This lien shall attach only to such interest as the owner may have in the property.

*whose instance and for whose benefit the improvement is made, has been the one most likely to suffer loss.* He pays at his peril the original contractor, who generally needs it and demands it as the work progresses.

*If he does not reserve enough of the fund in his own hands to pay for the labor of subcontractors and employees, and the price of materials, he incurs the risk of having to pay over again for at least a part of these items.*

. . . .

. . . The bond, as in this case[,] is conditioned for the faithful performance of the contract and securing the payment of the laborers and materialmen. *If the owner requires the contractor to procure the statutory bond, he is protected against loss. If he does not, he becomes liable to laborers and materialmen if the contractor fails to pay them, even though he may have paid the contractor in full. He has his remedy in his own hands.*

*Rio Grande Lumber Co. v. Darke,* 50 Utah 114, 122, 127, 167 P. 241, 244, 246 (1917) (emphasis added).

Even though the two statutes have similar language and similar purposes and have often been treated without differentiation, we will address the statutes separately in the interest of clarity.

Inasmuch as the issues before us are limited to questions of law, namely, questions of statutory interpretation, no deference need be given the trial court's conclusions. *Forbes v. St. Mark's Hospital,* 754 P.2d 933, 934 (Utah 1988). We therefore review the trial court's statutory interpretations for correctness. *Copper State Thrift and Loan v. Bruno,* 735 P.2d 387, 389 (Utah Ct.App.1987).

### PAYMENT BOND STATUTE

██ Wagner claims it was error for the trial court to conclude as a matter of law that the interior work done after assembly of the modular units did not constitute the "construction, addition to, alteration, or repair of any building, structure, or improvement upon land."

The legal issue before us is whether the leasing of the modular buildings was outside the scope of the Payment Bond Statute because the buildings might be considered personalty rather than realty. We hold that, for purposes of the Payment Bond Statute, the modular buildings are to be regarded as realty as a matter of law, and that the leasing of modular buildings is therefore within the scope of the Payment Bond Statute.

When stripped of its extraneous provisions, the plain language of section 14–2–1 of the Payment Bond Statute requires that "[t]he owner of any interest in land entering into a contract, involving $2,000 or more, for the construction . . . of any building . . . obtain from the contractor a bond. . . ." Application of this plain language to the uncontroverted facts of the present case provides a ready result.

Hercules entered into a contract with Modulaire to lease two modular office buildings. The lease agreement with Modulaire constituted a contract for the construction of a building involving $2,000 or more.[4] Wagner provided materials for the

---

**4.** The lease arrangement entered into between Hercules and Modulaire constituted "a contract" for the construction of a building. The parties stipulated at trial to the following contractual chain; "Hercules being at the top of a contract train, Modulaire being the second, Space Building Systems being third. . . . And then Grabber Utah, Plaintiff here involved in the chain." Hercules stipulation that it was in the contract chain for the construction of the complexes necessarily implies that its lease arrangement with Modulaire constituted a contract for the construction of a building.

Even absent the parties' stipulation, the leasing arrangement constitutes a contract for the construction of a building on its own merits. The purchase order by which Hercules leased the complexes from Modulaire states: "These complexes will be *built* to Hercules specification no. 9106." (emphasis added). The purchase order also states "Installation to be complete as soon as possible. Hercules will be responsible for site preparation, sewer, water and electrical service hookups." The purchase order also provided for one time charges for "delivery, set-up and skirting" of the complexes which were to be billed separately from the monthly lease payments. The construction contract between Mo-

buildings which were built under Hercules's lease agreement with Modulaire. Wagner did not receive payment from SBS for the materials. Hercules did not obtain a payment bond whereby Wagner could receive payment for the materials following SBS's failure to pay Wagner. Hercules is therefore personally liable to Wagner under section 14–2–2. *See King Bros., Inc.,* 440 P.2d at 19 (shipment of materials to the job site and their consumption in the construction of a building was "a sufficient basis upon which to predicate liability for defendant's failure to obtain the bond.").

Despite the apparently clear applicability of the Payment Bond Statute, Hercules contends that the modular buildings did not become part of the realty as is required before the Payment Bond Statute may be applied. We recognize the general principle that the modular buildings must be regarded as realty before the Payment Bond Statute will apply. The issue therefore becomes whether these modular buildings are to be regarded as realty for purposes of the Payment Bond Statute.

### Physical Nature of The Modular Buildings

■ Hercules seeks to avoid liability through application of the personal property "integration" test found in *Paul Mueller Co. v. Cache Valley Dairy Association,* 657 P.2d 1279 (Utah 1982).[5] The trial court applied the *Mueller* test to determine whether the modular buildings had become integrated into the land and found that they had not. The trial court therefore concluded that the leasing of the modular

office complexes did not constitute the construction of buildings. In effect, the trial court concluded that in order for a building to be a "building" under the Payment Bond Statute, it must be permanently anchored to the soil. There is, however, no such requirement.

The test established in *Mueller* does not apply to the present case because the issue addressed in *Mueller* is not the issue before us. The Payment Bond Statute applies when work is done on, or materials are provided for, (1) any building, (2) any structure, or (3) any improvement upon land. Section 14–2–1. *Mueller* dealt solely with the issue of whether whey drying *equipment* was an "improvement upon the land." The present case, on the other hand, involves the construction of "buildings" which is a separate and distinct category. In other words, the *Mueller* test for determining whether personal property had become an improvement upon land does not resolve the present issue of what constitutes a building.

■ If we were to adopt the *Mueller* test for what constitutes an improvement upon land as the test for what constitutes a building, we would effectively destroy the statutory "building" category. This we may not do because it would alter the materialman's burden of proof. "[T]he fact that the properties in question were buildings is of itself sufficient evidence that they were affixed to and became part of the realty...." *Waldorf v. Elliott,* 214 Or. 437, 330 P.2d 355, 357 (1958). If a materialman can prove that its materials were consumed

---

dulaire and SBS similarly refers to Hercules as the "Owner" and Modulaire as the "Contractor."

In any event, and in view of the foregoing indicators that the lease was viewed by the parties as a contract for the construction of a building, we conclude as a matter of law that the leasing arrangement was such a contract. If a lessee enters into an agreement to lease a building which is not currently on its land but will be constructed by the lessor, the lessee is necessarily entering into a contract to construct the building upon its land or the land in which it has an interest. The construction of the building is necessary before the lease may become effective. By entering into the lease the lessor incurs an obvious contractual obligation

to build the building. Inherent in such a lease is a contract for the construction of the building itself or else the lease agreement would be void and of no effect.

5. At issue in *Mueller* was whether whey drying equipment became part of the realty. The Utah Supreme Court considered the following three factors to determine whether the equipment had been sufficiently integrated into the realty so as to create a mechanic's lien: (1) the manner in which the equipment was attached or annexed to the realty; (2) whether the equipment was adaptable to the particular use of the realty; and (3) the intention of the annexor to make the equipment a permanent part of the realty. *Mueller,* 657 P.2d at 1282.

in a building, that is all the statute requires. We refuse to impose the additional requirement that a materialman go further and also prove that the building is an improvement upon the land.

Hercules fails to provide a single payment bond case requiring that a modular building be permanently anchored to the land. Hercules instead invokes the principle of *in pari materia* and relies upon mechanic's lien cases to establish a requirement that buildings be permanently anchored to the land before the Payment Bond Statute will apply. We are not persuaded. Our mechanic's lien cases, in fact, are either silent or support the opposite conclusion.

The first mechanic's lien case cited by Hercules is *Stanton Transportation Co. v. Davis*, 9 Utah 2d 184, 341 P.2d 207 (1959). In *Stanton*, subcontractors sought to foreclose mechanic's liens for the costs of transporting a drilling rig to the defendant's property and for tools used in the project. The *Stanton* court did not discuss whether a building must be permanently anchored to the land in order for a mechanic's lien to attach. In fact, the circumstances of the case support the opposite conclusion since a mechanic's lien was granted by the trial court for the labor expended in erecting the drilling rig, a temporary structure.

The second mechanic's lien case offered by Hercules is *Eccles Lumber Co. v. Martin*, 31 Utah 241, 87 P. 713 (1906). At issue in *Eccles* was whether the plaintiff had properly complied with the recording requirements of the lien statute. Again, whether a building must be permanently anchored to the soil was not discussed by the court.

A third mechanic's lien case that was not cited by Hercules, but that we find particularly persuasive on this issue, is *Sanford v. Kunkel*, 30 Utah 379, 85 P. 363, *modified in part*, 30 Utah 379, 85 P. 1012 (1906). In *Sanford*, a mechanic's lien was granted for labor and material against a house that had been removed from the property upon which it was constructed and placed on another lot. The Utah Supreme Court held

that the removal of the house did not destroy the lien on the land or on the house. We believe that if the actual removal of a building from the land will not defeat the attachment of a mechanic's lien to the building, then the mere intent to remove a building, as evidenced by the temporary manner in which the building is attached to the land, should not be permitted to defeat a lien, or, in this case, the Payment Bond Statute.

"It is settled ... that a building need not be physically anchored to the land to be considered realty. It may be found to be a fixture though it is secured to the realty by force of gravity alone." *Rinaldi v. Goller*, 48 Cal.2d 276, 309 P.2d 451, 453 (1957).

There is no reason why one object should not be deemed a fixture merely because it is heavy and requires no attachment when a lighter object can be said to have passed the test of annexation because its lightness requires some sort of device to attach it to the realty. The method of attachment does, of course, in some cases conclusively establish the article as part of the realty. The method of attachment, however, does not ever conclusively establish that certain articles are not a part of the realty...."

*Waldorf*, 330 P.2d at 357 (prefabricated grain tanks of imposing size and weight that appeared to be permanent constituted buildings even though they were attached to land by gravity alone).

■ The issue then becomes simply whether or not the modular office complexes are buildings. "What is a building must always be a question of degree; but ordinarily the word refers to a structure enclosing a space within walls and roof." 12 C.J.S. *Building* (1980) (footnotes omitted).

Hercules describes the office complexes as temporary trailers. This characterization is inaccurate. Hercules did not simply lease a few trailers to be used as portable offices; it leased two "complexes" from Modulaire. Modulaire delivered thirty modular units measuring fourteen feet by sixty feet that were assembled together in a stationary fashion to create two buildings that together contained over 25,000 square

feet of office space, complete with electricity, plumbing, climate control systems, sidewalks and parking lots.

The so-called "trailers" were nothing more than sections of a building that were transported to the building site upon their own wheels rather than upon a truck bed, a fact which is not controlling. *See generally Thorp Finance Corp. v. Wright*, 16 Utah 2d 267, 399 P.2d 206 (1965). Nor is it controlling that the units are taxed as self-contained mobile homes. *Id.* 399 P.2d at 208. It should also be noted that, according to the evidence submitted to the trial court, these units did not necessarily have four walls but were in fact designed to open into the neighboring units once assembled. We therefore conclude that these modular units could not be considered individual self-contained trailers.

Hercules argues that since the buildings were modular and could be disassembled and removed from the site, they were not permanent. We consider the buildings sufficiently permanent because they were assembled in a stationary manner and because Hercules could, if it so desired, retain the buildings on the Navy's land indefinitely by exercising its option to extend the lease or its option to purchase the buildings. Hercules has, in fact, extended the lease several times and has indicated its intention to purchase the buildings. Hercules has built parking lots and sidewalks around these buildings, as if they were to remain permanently. We also note the considerable expense incurred by Hercules in locating these modular buildings on the site and the significant expense that Hercules would incur in removing the buildings.

The fact that a stationary modular building is deliberately designed, assembled and installed in order to be disassembled and removed at some later date with relative ease does not prevent it from being a building. "Modern authority ... has minimized the importance of the method by which the article is attached or annexed to the realty." *Waldorf*, 330 P.2d at 357. We "must acknowledge that prebuilt [buildings], mobile or otherwise, ... are a part of our changing society, and give recognition to the fact that the law must be responsive to the best interests of those whom it is designed to serve." *Heath v. Parker*, 93 N.M. 680, 681–82, 604 P.2d 818, 819–20 (1980).

*Legal Nature of the Modular Buildings*

■ Hercules also argues that the lease agreement with Modulaire prevented the buildings from becoming realty. The Utah Supreme Court has already addressed this argument in a similar fact situation and rejected it. *Metals Manufacturing Co. v. Bank of Commerce*, 16 Utah 2d 74, 395 P.2d 914 (1964).

In *Metals Manufacturing*, the Bank of Commerce was the lessee of a building under a ten-year lease. A provision of the lease granted to the Bank the right to "make alterations, attach fixtures and erect additions, structures or signs" which were to remain the personal property of the Bank and which could be removed from the building by the Bank. The Bank, without obtaining a payment bond, contracted to have aluminum gates and railings installed, and paid the contractor for their installation. The contractor, however, did not pay the plaintiff who had supplied the gates and railings and the plaintiff sued for damages under the Payment Bond Statute.

The Bank argued that the intention of the Lessor and Lessee that the fixtures remain personal property, as evidenced by the lease, prevented the installation of the railings from being "an addition, alteration or repair of any building, structure or improvement on land" because the owner of the building and land would not receive any permanent benefit from the modifications.

The bank leans heavily on the principle that whether facilities such as these are part of the realty depends on the intentions of the parties. Generally this is true and binds the parties to the lease. However, it would seem to be unrealistic and unreasonable to conclude that such parties by agreement among themselves, could bind third party suppliers of materials *to the terms of an agreement to which such suppliers* were not privies and the terms of which they do not

know. Such conclusion could result in easy circumvention of the statute whose purpose clearly is to protect suppliers, if what they supply falls within the clear import of the statute.

*Id.,* 395 P.2d at 915. *See also King Bros., Inc,* 440 P.2d at 19 (materialmen have "no practical way" of knowing details of arrangements between an owner of a building and others who have actual title to the ground).

Hercules's assertion that a private agreement may prevent improvements from becoming realty for purposes of the Payment Bond Statute would effectively exclude from the scope of the statute all construction of, or improvements to, leased modular buildings. Under Hercules's approach, unsuspecting materialmen would be left unprotected for materials provided for leased modular buildings. The lessee of the modular building, however, would receive the direct benefit of such modifications without incurring any responsibility for payment. This result would be directly contrary to the purpose of the Payment Bond Statute.

The purpose of the mechanics' and materialmen's lien statutes and likewise the [Payment Bond Statute] is to prevent the owners of land from having their lands improved with the materials and labor furnished and performed by third persons, and thus to enhance the value of such lands, without becoming personally responsible for the reasonable value of the materials and labor which enhance the value of those lands.

*Crane Co. v. Utah Motor Park, Inc.,* 8 Utah 2d 413, 416, 335 P.2d 837, 839 (1959).

The fact that a lease was used as the contract whereby the buildings were constructed is of no consequence when it was Hercules who caused the buildings to be built, thereby causing the consumption of Wagner's materials, and it was Hercules's leasehold interests that were directly benefited by the materials.

**6.** It is well established that the holder of an interest in realty which is less than fee title in the soil may be considered an owner for purposes of the Mechanic's Lien Statute. *King*

Summary as to Nature of The Buildings

Although the modular buildings may constitute personal property as between Hercules and the Navy because they have not been permanently anchored to the land, and although the lease agreement may have caused the buildings to retain their personal property status as between Hercules and Modulaire, as between Hercules and its materialman, Wagner, we regard the buildings to be real property.

Our holding gives full effect to the purpose of the Payment Bond Statute which is that the risk of loss be borne by "the owner of the premises, at whose instance and for whose benefit the improvement [was] made." *Rio Grande,* 167 P. at 244. By failing to obtain a payment bond, Hercules ignored its statutory duty to insure Wagner's payment and is therefore personally liable to Wagner.

## MECHANIC'S LIEN STATUTE

■ Wagner also argues that it was error for the trial court to dismiss its mechanic's lien foreclosure action due to its conclusion of law that Hercules's interest in the real property was inalienable and therefore insufficient to be attached under the Mechanic's Lien Statute. The issue before us then is whether alienability is a precondition to the attachment of a mechanic's lien. We hold that there is no such precondition.

The Mechanic's Lien Statute does not require that an owner's interest in real property be alienable before a mechanic's lien may attach. The only applicable precondition to the attachment of Wagner's mechanic's lien is that Wagner furnish "any materials ... used in the construction ... of any building." Section 38–1–3.

An alienability test, as adopted by the trial court, would be impossible to administer because of the unique nature of each real estate transaction. There is a multitude of "interests" an "owner" may have in property that may be liened,[6] each with

*Bros., Inc.,* 440 P.2d at 19. A mechanic's lien may attach to a leasehold estate, *e.g. Interiors Contracting, Inc.,* 648 P.2d at 1386, or an equitable interest pursuant to a real estate con-

its own unique degree of alienability. For example, a donated parcel of property may have a reversionary interest in the event the property is no longer used for the purpose for which it was donated. Similarly, a lease may be unassignable, or may require written landlord approval prior to assignment. The possible degrees of alienability are limited only by the ingenuity of the parties involved. There is no clear line indicating that one degree of alienability would be sufficient and another would be insufficient. The unavoidable result would be confusion and arbitrariness in our mechanic's lien law.

■ We believe that the question of alienability is adequately provided for in the language of the Mechanic's Lien Statute. Alienability is but one of the rights contained in the bundle of property rights which an owner may possess. A mechanic's lien attaches "to such interest as the owner may have in the property." Section 38–1–3. We interpret this phrase to allow attachment of a mechanic's lien to the entire bundle of property rights belonging to the owner, whatever it may contain, without any requirement that any particular right, such as unrestrained alienability, be present.

If we were to exceed the plain language of the Mechanic's Lien Statute and impose the additional requirement that the property interest of an owner be sufficiently alienable before a mechanic's lien could attach, we would create great uncertainty which would, in effect, shift the risk of loss to materialmen and laborers. Materialmen and laborers, who have "no practical way" of knowing the legal status of the property they improve, *King Bros., Inc.,* 440 P.2d at 19, would not know in advance whether the property they are improving is tainted by a restraint on alienability. In such cases materialmen and laborers would bear the risk of loss, rather than the owner who has received the benefit. This is contrary to the clear goal of the Mechanic's Lien Statute which is that the property owner bear

the risk of loss. *See Rio Grande Lumber Co.,* 167 P. at 244.

Ultimately, recognizing alienability as a precondition to the attachment of a mechanic's lien would destroy the Mechanic's Lien Statute. Owners could easily circumvent the Mechanic's Lien Statute by simply creating an inalienable interest in the land or in the building. We will not adopt a rule permitting such ready circumvention of the Mechanic's Lien Statute. *Metals Manufacturing Co.,* 395 P.2d at 915.

We also conclude that our reasoning above, i.e., that a building need not be permanently anchored to the soil before the Payment Bond Statute will apply, is equally applicable to the Mechanic's Lien Statute. The Mechanic's Lien Statute provides in relevant part that "all persons ... furnishing ... any materials ... used in the construction, alteration or improvement of any building, ... shall have a lien upon the property upon ... which they have ... furnished ... materials...." Section 38–1–3.

■ Again, the *Mueller* test does not apply because the statute expressly refers to three types of modification to real property each carrying different tests. A mechanic's lien is expressly created for the value of materials supplied for the construction of a building. A materialman therefore only needs to prove that its materials were consumed in the construction of a building. The issue again becomes whether the modular office complexes constitute buildings for purposes of the Mechanic's Lien Statute. We conclude, for the same reasons stated above, that these sizable stationary modular complexes, complete with electricity, plumbing, climate control systems, sidewalks and parking lots, constitute buildings for purposes of the Mechanic's Lien Statute. The buildings are sufficiently permanent in that they may remain on the site indefinitely at Hercules's discretion.

■ Wagner provided drywall materials that were consumed in finishing the interi-

tract, *e.g. Roberts v. Hansen,* 25 Utah 2d 190, 479 P.2d 345 (1971), or a building which has been

removed from the land upon which it was constructed, *Sanford,* 85 P. at 366.

ors of the modular buildings. Wagner therefore has a lien against the improved property. The issue then becomes, to what property does the lien attach? Hercules claims that a mechanic's lien cannot attach because its interest in the land cannot be "sold judicially." To focus solely on Hercules's interest in the land, however, ignores other property interests belonging to Hercules to which a mechanic's lien might properly attach.

In order to effectuate the purposes of the Mechanic's Lien Statute, the words "property," "realty," and "land" are to be broadly construed to include all property interests affected.

> The word "land" as used in the law, has since time immemorial been regarded as a generic term. It "... includes not only the soil, but everything attached to it, whether attached by the course of nature, as trees, herbage and water, or by the hand of man, as *buildings*, fixtures and fences." This is particularly true with respect to these lien statutes which should be liberally construed to effectuate their purpose.

*King Bros., Inc.*, 440 P.2d at 19 (quoting 42 Am.Jur. *Property*, p. 196, and adding emphasis) (footnote omitted).

Hercules has two separate and distinct property interests: (1) an equitable interest in the Navy's land pursuant to the award/contract; and (2) an equitable interest in the buildings pursuant to a leasing arrangement with Modulaire. When combined, these two component interests constitute the property that was benefited by Wagner's materials. Wagner's lien attached to this cumulative property interest. We believe that in order to give full effect to the Mechanic's Lien Statute, Wagner

may pursue the sale of the component property interests separately.

> [I]t has become quite generally recognized that at least in certain circumstances a mechanic's lien may attach to and be enforced against buildings or improvements alone. Thus a mechanic's lien upon improvements separately [sic] from the real estate has been upheld where the improvements and the land are not owned by the same party ... or where the building constitutes a trade fixture and is thus not a part of the realty and is removable by the tenant or a licensee.

53 Am.Jur.2d *Mechanics' Liens* § 257 (1970) (footnotes omitted).

In the present case, the buildings are owned by Modulaire and the land is owned by the Navy.[7] Hercules brought these two separate ownerships together by virtue of its contract with the Navy and its lease with Modulaire. Where, as Hercules has argued, these buildings may easily be removed from the land without causing great injury to the land or the buildings, and where Hercules has shown that it has the right to remove the buildings, Hercules's component property interests may be sold separately at judicial sale. *See Sanford*, 85 P. at 367 (the supreme court directed the trial court to order the sale of the original lot first; if the proceeds were insufficient to satisfy the liens, the house was to be sold) *modified in part*, 30 Utah 379, 85 P. 1012, 1013 (1906) (clarifying that the purchaser of the house at judicial sale would have the right to remove the house from its new location).

## CONCLUSION

We find that the modular buildings, as a matter of law, constitute realty for pur-

---

**7.** Hercules argued on appeal that the Miller Act, 40 U.S.C.A. §§ 270a *et seq.* (West 1986), which requires the procurement of performance and payment bonds on any public building or public work of the United States, applies to prevent a mechanic's lien from attaching to the Navy's land. This issue was raised for the first time on appeal and we need not address it. *Heiner v. S.J. Groves & Sons Co.*, 790 P.2d 107, 115 (Utah Ct.App.1990). However, in order to clarify the property interest being attached, we will point out that Wagner's lien attaches only to Hercules's interest in the land, whatever that might be, unless the improvements were made at "the instance of" the Navy. *Interiors Contracting, Inc.*, 648 P.2d at 1386. The Miller Act therefore does not prevent the attachment of the lien to Hercules's interest and may only apply if Wagner were to try attach the Navy's interest in the land. Inasmuch as that issue is not before us, we do not speculate on how the Miller Act may apply in that circumstance.

poses of the Payment Bond Statute. The trial court's determination that Hercules's leasing of the modular buildings did not constitute the construction of "any building" was therefore an erroneous conclusion of law. Based on the uncontested facts, we remand and instruct the trial court to find for Wagner and to determine the reasonable value of the materials furnished in accordance with section 14–2–2 and any other remedy to which Wagner may be entitled under the Payment Bond Statute.

We also conclude that alienability of an owner's property interest is not a precondition to the attachment of a mechanic's lien. The trial court's dismissal of Wagner's foreclosure action based on the purported inalienability of Hercules's property interest in the land was therefore based on an erroneous conclusion of law. We find that the modular buildings, as a matter of law, constitute realty for purposes of the Mechanic's Lien Statute. The foreclosure action is therefore reinstated.

Reversed and remanded for further proceedings consistent with this opinion.

DAVIDSON and ORME, JJ., concur.