PAUL MUELLER COMPANY, a Missouri corporation, and Dahle Construction, a Utah partnership, Plaintiffs, Appellants and Cross-Respondents,

v.

CACHE VALLEY DAIRY ASSOCIATION, a Utah agricultural cooperative corporation, Defendant, Respondent and Cross-Appellant.

PAUL MUELLER COMPANY, a Missouri Corporation, and Dahle Construction Company, a Utah partnership, Plaintiffs and Appellants,

v.

CACHE VALLEY DAIRY ASSOCIATION, a Utah agricultural cooperative corporation, Defendant and Respondent.

Nos. 17743, 17745.

Supreme Court of Utah.

Dec. 6, 1982.

Bruce L. Jorgensen, Gary N. Anderson and Gordon J. Low, Logan, for plaintiffs, appellants and cross-respondents.

B.H. Harris, George W. Preston and Joseph M. Chambers, Logan, for defendant, respondent and cross-appellant.

HALL, Chief Justice:

Appellants Paul Mueller Company (Mueller) and Dahle Construction Company (Dahle) appeal from the trial court's refusal to enforce their claimed mechanic's liens

against respondent Cache Valley Dairy Association on whey drying equipment possessed by the latter. Respondent, in turn, cross-appeals from that court's denial of its counterclaim relating to defective manufacture and installation of the equipment by appellants. In addition, appellants and respondent all contest the amount of attorney fees awarded by the court to respondent.

### I. Appellants' Claim

In 1978, respondent contracted with Maxum Corporation (Maxum), a Delaware firm, for the installation of a whey drying system on respondent's premises. Maxum subcontracted with appellant Mueller to construct four large drying cylinders, a drying chamber and other parts of the system and with appellant Dahle to assemble and install the system. In order to house the whey drying equipment, respondent engaged a separate contractor to pour a cement foundation and to assemble a four-story prefabricated metal building thereon.

Following the manufacture by Mueller of the parts ordered by Maxum, Dahle assembled the large drying chamber and cylinders and moved them into the building. Dahle also constructed a manlift and walkways within the building and installed various ducts, frameworks and other equipment in order to connect parts of the system to each other and to the building.

After respondent had paid Maxum in full for the drying system, Maxum declared bankruptcy, leaving unpaid balances owing to both Mueller and Dahle. Mueller and Dahle each filed a notice of lien upon the whey drying equipment under the provisions of U.C.A., 1953, §§ 38–1–3 and 38–1–4. The former statute states:

> Contractors, subcontractors and all persons performing any services or furnishing or renting any materials or equipment used in the construction, alteration, or improvement of any building or structure or improvement to any premises in any manner ... shall have a lien upon the property upon or concerning which they have rendered service, performed la-

bor or furnished or rented materials, or equipment for the value of the service rendered, labor performed or materials or equipment furnished or rented by each respectively, whether at the instance of the owner or any other person acting by his authority as agent, contractor or otherwise.

Appellants then filed this action against respondent to foreclose the alleged liens, claiming also that respondent should bear liability for the debts of its contractor under the provisions of U.C.A., 1953, §§ 14–2–1 and 14–2–2. Those statutes provide, respectively, as follows:

> The owner of any interest in land entering into a contract, involving $2,000 or more, for the construction, addition to, or alteration or repair of, *any building, structure or improvement upon land* shall, before any such work is commenced, obtain from the contractor a bond in a sum equal to the contract price, with good and sufficient sureties, conditioned for the faithful performance of the contract and prompt payment for material furnished and labor performed under the contract. Such bond shall run to the owner and to all other persons as their interest may appear; and any person who has furnished materials or performed labor for or upon any such building, structure or improvement, payment for which has not been made, shall have a direct right of action against the sureties upon such bond for the reasonable value of the materials furnished or labor performed, not exceeding, however, in any case the prices agreed upon .... [Emphasis added.]

> Any person subject to the provisions of this chapter, who shall fail to obtain such good and sufficient bond, or to exhibit the same, as herein required, shall be personally liable to all persons who have furnished materials or performed labor under the contract for the reasonable value of such materials furnished or labor performed, not exceeding, however, in any case the prices agreed upon.

The trial court found that the equipment manufactured by Mueller and much of the equipment installed by Dahle constituted personal property rather than improvements to realty as required by §§ 14–2–1 and 38–1–4, and that appellants therefore held no statutory liens upon the equipment. Although the court found the manlift and walkways constructed by Dahle to be fixtures to which a statutory lien might apply, the court refused to recognize such a lien on the part of Dahle, finding no substantial evidence to indicate what percentage of Maxum's debt to Dahle represented work on the latter items and what percentage represented assembly of the items found to be personal property. Appellants contend that the evidence clearly preponderates against these findings, requiring instead a finding that all of the whey drying equipment constituted "structure[s] or improvement[s] upon land" subject to the statutory liens.

In distinguishing between real and personal property for statutory lien purposes, this Court has adopted a tripartite test, giving consideration to the following factors:

> (1) [the] manner in which the item is attached or annexed to realty; (2) whether the item is adaptable to the particular use of the realty; and (3) the intention of the annexor to make an item a permanent part of the realty.[1]

The trial court referred to the above three factors in determining the lien status of respondent's equipment, finding:

> After the examination [of] the manner in which the equipment was attached, and the particular use of the machinery and the intent of the parties, the Court determines the said equipment to be personalty . . . .

We therefore review the evidence presented concerning the elements of annexation, ad-aptation and intent in order to determine whether such evidence supports the trial court's findings. Appellants and respondent agree that if, and only if, the evidence "clearly preponderates" against the court's findings, this Court must overrule those findings.[2]

A. Annexation

■■■ The evidence shows that the whey drying equipment was attached to the building by means of ducts, wiring and welding and that some equipment was bolted into the cement floor. However, mere physical attachment to a building does not necessarily confer fixture status upon what would otherwise constitute personal property.[3] In the present case, respondent presented evidence to show that most of the ducts and wires connecting equipment to the metal building consisted of detachable sections designed for easy removal and that respondent requested the attachment of lifting lugs to the larger pieces of equipment so that they could be more easily lifted and transported from the building. The trial court, having personally inspected the whey drying equipment in the presence of counsel, found that the bolts securing machinery to the floor could be disconnected easily and that equipment could be removed without damage to the building. The evidence therefore did not compel a finding that the whey dryer was annexed to respondent's property.

B. Adaptation

■■■ Appellants claim that the whey drying equipment was adapted to respondent's property by virtue of the fact that the building housing the equipment was used solely for whey drying. Appellants misinterpret the concept of adaptation as used by courts in determining the character of property. Adaptation occurs when per-

1. *State v. Papanikolas,* 19 Utah 2d 153, 427 P.2d 749, 751 (1967).

2. *Del Porto v. Nicolo,* Utah, 495 P.2d 811 (1972).

3. *Workman v. Henrie,* 71 Utah 400, 266 P. 1033 (1928); *King Brothers, Inc. v. Utah Dry Kiln Co.,* 13 Utah 2d 339, 374 P.2d 254 (1962).

sonal property is integrated into real property in furtherance of a specific purpose to which the real property has been devoted, as, for example, when the owner of a brick kiln integrates a furnace into the kiln.[4] Equipment is not "adapted" to the use of real property where the real property itself is adaptable to multiple uses and where it is solely the presence of the equipment itself which determines the purpose served by the real property.

In the present case, the real property in question consists of a prefabricated metal building with a concrete floor, a man-lift, walkways and supporting structures. The building itself has no characteristics which in any way limit its use to whey drying, nor did it exist as a whey drying "plant" prior to respondent's acquisition of the equipment in question. As noted above, respondent connected the equipment to the building in a manner which allows removal of the equipment without significant damage to the building. The trial court, in its findings, observed:

> The whey drying equipment is not one [sic] that was made or constructed for the particular use of this building but was suitable for any other plant of this nature. This building was constructed for and adapted to house this machinery much in the same way that many buildings are constructed to house farm machinery, or fabricated machinery which remain personalty. That machinery in question here has nothing to do with servicing the building such as a furnace and duct work do a house for heating purposes.

The court correctly found respondent's building to be suitable for multiple uses rather than for a single use corresponding to the function of the whey drying equipment.

## C. Intention of the real property owner

The parties agree that of the three elements to be considered in determining whether the whey dryer is real or personal property, the most important is intention. Concerning this element, this Court has stated:

> In order to qualify under these [mechanic's lien] statutes it is necessary that there must be annexation to the land ... and this *must* have been done with the intention of making [the personal property] a permanent part thereof. [Emphasis added.][5]

Factors to be considered in determining whether such an intention exists include annexation and adaptation, discussed above, as well as

> the relation and situation of the party making the annexation, the policy of the law in relation thereto, the structure and mode of the annexation, and the purpose or use for which the annexation has been made.[6]

In the present case, testimony by respondent's general manager tends to show an absence of intent on the part of respondent to incorporate the whey drying equipment into its real property:

> [T]he building was designed specifically so that we could house that piece of equipment, so that we could get that piece of equipment into the building, so that we could get that piece of equipment out of the building without any particular problem if at some time down the line in the future we decided that the economies in whey drying justified us going into some other drying operation.

> &ast; &ast; &ast; &ast; &ast; &ast;

> The reason we chose a metal building was because of its versatility. It's a con-

---

**4.** *King Brothers, Inc. v. Utah Dry Kiln Co.,* supra, n. 3. See *Progress Press-Brick & Machine Co. v. Gratiot Brick & Quarry Co.,* 151 Mo. 501, 52 S.W. 401 (1899).

**5.** *King Brothers, Inc. v. Utah Dry Kiln Co.,* supra, n. 3.

**6.** *Builders Appliance Supply Co. v. A.R. John Construction Co.,* 253 Or. 582, 455 P.2d 615 (1969).

struction which is bolted together, it's very easily unbolted, and it provides maximum flexibility and the moving in and moving out of equipment.

Testimony by a salesman of dairy equipment showed that it is common practice to transport used whey drying equipment from its original location for purposes of sale or use in another locality:

Q Do you have an opinion as to whether or not those tanks could be moved from Cache Valley Dairy to another place?

A Certainly they could be moved.

Q And are they a merchantable type item that might be purchased by some other individual in the same business somewhere else in the country?

A Yes.

Q Would there be a problem with selling that type of equipment?

A Not very, no.

Q Is there a demand for that type of equipment?

A You bet.

\*    \*    \*    \*    \*    \*

. . . I particularly am not adaptable to whey drying equipment, but I'm familiar with it and it's bought and sold, used and new.

Q And I assume when it's bought and sold it has to change places and locations and everything?

A Oh, yes.

Respondent's attachment of lifting lugs to the whey drying cylinders and its provision for relatively easy disconnection of the equipment also tend to show an absence of intention to annex the equipment.

In addition to the above structural and testimonial evidence as to the character of respondent's equipment, the trial court admitted as evidence a lease agreement between respondent and First Security Leasing Company by which respondent had acquired the whey drying equipment. In that agreement, respondent and First Security Leasing Company characterize the whey drying equipment as personal property. Appellants complain that the provisions of the agreement are irrelevant to the present issue and that the trial court should not have admitted the agreement. Appellants claim that by doing so, that court imposed upon appellants the terms of a contract to which they were not parties.

The findings of the trial court do not indicate that the characterization of respondent's property contained in the lease agreement in any way influenced the court's own decision concerning the nature of the property. Even assuming that the court did consider provisions of the lease as evidence, the lease constituted only one of many items of evidence presented on the issue of respondent's intent. If the court had excluded the lease from other such evidence, that which remained still would not preponderate against that court's findings. Therefore, we need not consider the propriety of the court's admission of the lease.

■ Appellant Dahle claims that because the trial court did not find the manlift and walkways to be personal property, the court should have enforced a lien against these items for a portion of the total balance owed to Dahle. However, Dahle presented no evidence as to what percentage of its total labor had been expended towards construction of the manlift and walkways other than a rough guess by the company's managing partner. Nor did Dahle attempt to establish the percentage of its current balance due which represented such labor. The evidence shows that Dahle received partial payment for its installation labor prior to Maxum's bankruptcy and that the manlift was the first item installed by Dahle. The trial court reasonably may have concluded that the portion of Dahle's labor for which early payment was made included much or all of the labor incurred in construction of the items which it determined to be fixtures. The court therefore did not err in refusing to recognize in Dahle a lien against these items.

## II. Respondent's Counterclaim

Respondent counterclaimed against each appellant. Respondent alleged that Dahle had improperly welded the drying chamber and that Mueller had omitted certain vertical joining flanges from the chamber, decreasing its structural integrity. Claiming that these and other defects rendered the chamber worthless, respondent requested damages from appellants under theories of negligence, breach of contract and slander of title. The trial court denied respondent's counterclaim.

In appealing the denial of its counterclaim, respondent relies solely on negligence theory, contending that appellants owed to it a manufacturer's duty of due care. Respondent claims that a manufacturer must exercise care not only to guard against injury to foreseeable users of its product, but also to protect such users from economic loss attributable to nondangerous defects in the product. In support of this proposition, respondent cites *W.R.H. v. Economy Builders Supply,*[7] a case decided after issuance of the trial court's final order. Respondent urges this Court to consider that order in light of the *W.R.H.* decision.

■ Assuming, *arguendo,* that the *W.R.H.* case established a duty of reasonable care on the part of a manufacturer to guard against economic loss to users of its product, such a duty would not apply to appellants in the present case. Appellants are not "manufacturers" comparable to the manufacturer in the *W.R.H.* case. While the latter manufactured products destined for retail sale to unknown and potentially inexperienced purchasers, appellants provided their products and services to a presumably knowledgeable contractor in accordance with detailed contract specifications. Appellants in no way concealed the alleged defects in the drying chamber from Maxum and were in no better position to anticipate possible economic consequences of such defects than was Maxum itself.

Having contracted directly with Maxum and knowing of Maxum's close supervision of the entire installation process, appellants had reason to expect that Maxum would protect respondent's interest by observing and obtaining correction of obvious defects. The trial court correctly found that Maxum bore responsibility for correction of such defects.

■ Even if appellants had breached a duty towards respondent by defectively constructing the drying chamber, the evidence would not support recovery by respondent in the absence of a showing that the alleged defects actually caused damages to respondent. Although respondent in its brief alleges that the drying chamber fails to meet U.S.D.A. standards and that it has no value, testimony shows that it was using the chamber and other drying equipment at the time of trial. The evidence shows no actual loss to respondent's business resulting from the alleged defects and respondent's brief contains no discussion whatsoever concerning either causation or damages. We hold that respondent has shown neither a duty on the part of appellants to protect it against nondangerous, nonconcealed defects in the drying chamber nor the additional elements of causation and damages. The trial court therefore correctly denied respondent's counterclaim.

## III. Attorney Fees

The trial court awarded to respondent $17,000 in attorney fees, dividing liability for this amount equally between appellants. Although appellants concede that the amount of the award is reasonable, appellant Dahle contests the equal apportionment of that award between itself and appellant Mueller. Dahle asserts that because of the fact that Mueller asserted a significantly larger claim on respondent's property than did Dahle, Mueller's responsibility for attorney fees should be proportionately greater than that of Dahle. Dahle claims

---

7. Utah, 633 P.2d 42 (1981).

that the court had no evidentiary basis upon which to divide liability equally between appellants.

At the post-trial hearing concerning the court's proposed findings of fact and conclusions of law, counsel for Dahle pointed out that the court had failed to apportion liability for the $17,000 award, whereupon the court entertained suggestions from the various counsel as to the proper method of apportionment. Dahle's counsel proposed that each plaintiff be assessed an amount in proportion to its original claim against respondent. The court's decision to divide the liability equally followed a statement by counsel for respondent that he had spent equal time defending both claims. Dahle contends that this statement alone constituted an inadequate basis upon which to make that decision.

■ It is this Court's policy to accord great deference to the discretionary conclusions of the trial court regarding attorney fees. "In the absence of abuse of discretion, the amount of the award by the district court will not be disturbed."[8] However, the long-standing rule regarding the establishment of attorney fees is as was discussed and articulated in the case of *Mason v. Mason*.[9] "It is well established that to justify a finding of a reasonable attorney's fee, there must be *evidence* in support of that finding." (Emphasis added.)

A more recent, and somewhat more emphatic declaration of this rule was made in the case of *Freed Finance Co. v. Stoker Motor Co.*[10] In *Freed,* a substantial attorney fee award was included in the trial court's order of summary judgment. On review, this Court held:

Even if there were no disputed issue of material fact, the summary judgment could not award an attorney's fee without a stipulation as to the amount, an unrebutted affidavit, or evidence given as to the value thereof.

*Id.* at 1040.

■ A similar application of this rule is found in the case of *Richards v. Hodson,*[11] which is one of several cases cited as authority for the *Freed* decision. There, the Court stated: "This Court has on numerous occasions held that attorney's fees cannot be allowed unless there is evidence to support them." *Id.* at 1046. It is beyond dispute that an evidentiary basis is a fundamental requirement for establishing an award of attorney fees. It follows, therefore, that an award made without adequate evidence to support it constitutes an abuse of discretion and must be overruled by this Court.

In this case, the parties by stipulation presented detailed billing records to the court as the evidentiary basis upon which the court could determine a reasonable attorney fee award for the prevailing party. The record indicates, however, that the court's decision to apportion the liability equally was not based on this evidence, but rather was derived wholly from the post-trial statement of counsel.

■ In the case of *Sharp v. Hui Wahine, Inc.,*[12] a mortgagee was denied attorney fees after successfully prosecuting a foreclosure suit, because counsel had not offered evidence other than his opinion to support the award he sought. The Hawaii Supreme Court stated:

Counsel submitted neither evidence of the customary charges of the Bar nor any expert testimony other than their own self-serving opinions to show the reasonableness of their fees. As has been aptly

---

**8.** *Turtle Management, Inc. v. Haggis Management,* Utah, 645 P.2d 667, 671 (1982).

**9.** 108 Utah 428, 160 P.2d 730, 733 (1945).

**10.** Utah, 537 P.2d 1039, 1040 (1975).

**11.** 26 Utah 2d 113, 485 P.2d 1044, 1046 (1971). See also, *Brasher Motor and Finance Co. v. Anderson,* 20 Utah 2d 104, 433 P.2d 608 (1967).

**12.** Hawaii, 413 P.2d 242 (1966).

stated: "... while the mortgagee's attorney may not be an incompetent witness, it is not good practice to make an award [of an attorney fee] predicated only on his opinion." 59 C.J.S. Mortgages § 812e(2), at 1554.

*Id.* at 246, 247. The foregoing ruling is in accord with the evidentiary rule set forth by this Court in the *Mason, Freed* and *Richards* cases, *supra.* The statement of respondents' counsel at the post-trial hearing did not provide an adequate evidentiary basis for the trial court's apportionment ruling. There was no indication that the statement was derived from the stipulated billing records, nor from any other competent evidentiary source. It was, therefore, an abuse of discretion for the trial court to rely on that statement to support its apportionment decision.

Counsel for respondent claims that although the trial court may have properly apportioned its attorney fee award, the amount of that award is inadequate. Detailed billing records prepared by respondent's counsel show a total of 693 billable hours spent in defense against appellants' claims and in prosecution of respondent's counterclaim, for which counsel billed $47,000. The lower court awarded to respondent $17,000 in attorney fees. Respondent contends that this award represents only 36% of the actual attorney fees incurred, that it is grossly inadequate and that it does not constitute a reasonable attorney fee.

In response, appellants point out that a large measure of the billable hours of respondent's counsel are attributable to his prosecution of the counterclaim. Because the counterclaim was unsuccessful, the hours spent in the prosecution thereof are noncompensable. Appellants' reasoning is supported by this Court's recent decision in the case of *Utah Farm Production Credit Association v. Cox.*[13] There, the Court refused to award attorney fees altogether, because the prevailing plaintiff failed to provide enough proof to enable the court to distinguish the portion of plaintiff's fees spent in prosecuting the complaint from the portion spent in defending the counterclaim. The Court, relying upon already established principles, stated:

In the case of *Stubbs v. Hemmert,*[14] this Court ruled that the plaintiff was not entitled to reimbursement for fees he had incurred in defending a counterclaim in a foreclosure action. A party is therefore entitled only to those fees resulting from its principal cause of action for which there is a contractual (or statutory) obligation for attorney's fees.

Accordingly, only those billable hours attributable to respondent's defense of the main causes of action were compensable. In contrast to the situation in the *Cox* case, the trial court in the present case had sufficient information before it in the billing records to enable it to separate the counterclaim hours from those spent in defense of the main causes of action. The award of $17,000 was, therefore, derived from a sound evidentiary basis, and will not be disturbed by this Court on appeal.

In view of the foregoing, the matter of attorney fees is remanded for the limited purpose of determining, either from the billing records or from additional evidence, a reasonable and equitable apportionment between appellants of liability for the $17,000 award.

STEWART, OAKS, HOWE and DURHAM, JJ., concur.

---

**13.** Utah, 627 P.2d 62 (1981).

**14.** Utah, 567 P.2d 168 (1977).