SALT LAKE CITY CORPORATION, a municipal corporation of the State of Utah, Plaintiff,

v.

KASLER CORPORATION, a California corporation, Defendant.

KASLER CORPORATION, a California corporation, Third-party Plaintiff,

v.

MONROC, INC., a Delaware corporation; Holnam, Inc., a Delaware corporation; Protex Industries, Inc., a Colorado corporation; Chen–Northern, Inc., a Utah corporation; DMJM, a Utah corporation, Third-party Defendants.

Civ. No. 90–C–382G.

United States District Court, D. Utah, C.D.

Jan. 10, 1994.

Roger F. Cutler, Salt Lake City Attorney's Office, Salt Lake City, UT.

Michael W Homer, Salt Lake City, UT.

Ray G. Martineau, Salt Lake City, UT.

Craig R. Mariger, Jones, Waldo, Holbrook & McDonough, Salt Lake City, UT.

Lynn B. Larsen and Jack Reed, Larsen, Elton & Reed, Salt Lake City, UT, for third-party plaintiff, Kasler.

Jan C. Graham, Utah Atty. General's Office, Salt Lake City, UT.

George Naegle, Michael Drake and Nelson L. Hayes, Salt Lake City, UT, for third-party defendant, Monroc.

## MEMORANDUM DECISION and ORDER RE: SUMMARY JUDGMENT

**J. THOMAS GREENE, District Judge.**

This matter came before the court on third-party defendant Monroc's motion for summary judgment and third-party plaintiff Kasler's constitutional challenge to Utah's Uniform Commercial Code statute of repose, Utah Code Ann. (1990) § 70A–2–725. Third-party plaintiff, Kasler, was represented by Lynn Larsen and Jack Reed. Third-party defendant Monroc was represented by George Naegle, Michael Drake and Nelson L. Hayes. The parties filed extensive memoranda and supporting materials, after which the court heard oral argument and took the matter under advisement. Pursuant to 28 U.S.C. § 2403, which declares that the state shall be allowed to intervene on a constitutional challenge to any statute "affecting the public interest," Utah's Attorney General was notified of this constitutional challenge and provided the opportunity to intervene. The State of Utah did not intervene. Now being fully advised, the court renders its Memorandum Decision and Order.

### FACTUAL BACKGROUND

Salt Lake City Airport Authority ("Airport Authority") undertook construction of an apron and connecting taxiway for Concourse D at the Salt Lake City International Airport. Kasler Corporation ("Kasler") was

hired in August of 1983 as the general contractor for the project. In September of 1983, Kasler entered into two purchase agreements ("Purchase Agreements") with Monroc, Inc., ("Monroc"). Pursuant to the Purchase Agreements, Monroc agreed to provide coarse and fine concrete aggregates for the project and completed its obligations at least by December of 1984.[1]

Shortly after completion of the project, the concrete began spalling.[2] The Airport Authority notified Kasler that the surface had begun deteriorating by letter dated May 21, 1985.[3] In November 1985, a Kasler representative visited the Salt Lake Airport, and concluded that the problem was localized and very minor.

In May 1988, a different Kasler representative, Bob Varshay, inspected the site. No action was taken to resolve the problem, and the cause of the problem was not identified. By letter dated January 22, 1990, Salt Lake City, on behalf of the Airport Authority, informed Kasler that it intended to pursue legal action against Kasler. On June 14, 1990, Salt Lake City filed a complaint against Kasler, alleging breach of contract, breach of guarantee, breach of implied warranties, and negligence. Immediately thereafter, Kasler filed a third-party complaint against Monroc, asserting various contract and tort claims. On May 21, 1991, Salt Lake City settled its claims against Kasler for $1.5 million. Kasler received an assignment of all of Salt Lake City's rights, including rights to damages, contribution and indemnity as part of the settlement.

Kasler's third-party complaint is the genesis of Monroc's summary judgment motion. Kasler alleged breach of contract, breach of express and implied warranties, strict liability, negligence, negligent misrepresentation, products liability, breach of indemnification agreement and contribution. Kasler alleges that Monroc breached the contract by providing concrete aggregate that did not meet the specifications of the contract. Monroc

claims that the statute of limitations bars the action and that Kasler and Salt Lake City knowingly accepted out-of-specification materials.

## STANDARD OF REVIEW

■ Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. In considering summary judgment, the judge does not weigh the evidence and determine the truth of the matter, but rather determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## ANALYSIS

### I. *THE UNIFORM COMMERCIAL CODE CONTROLS THIS DISPUTE*

This court determines as a matter of law that the Uniform Commercial Code, ("UCC"), controls this litigation. Kasler argues that the UCC does not apply because Kasler is not a merchant dealing in goods for UCC purposes. Monroc counters that Kasler is a merchant and the subject of this dispute is a contract for goods.

■ Pursuant to Section 70A–2–104(1) of the Utah Code, a merchant is:

> a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction.

Utah Code Ann. § 70A–2–104(1) (1990). Kasler, a general engineering contractor, is in the business of making concrete and constructing concrete objects. Kasler's occupation necessarily makes it deal in concrete aggregates and requires skill peculiar to the

---

**1.** Monroc asserts that it completed its deliveries under the Purchase Agreements by July of 1984, and Kasler asserts that it was December of 1984. Under the analysis employed herein, the date of completion of deliveries is not controlling.

**2.** "Spalling" is the crumbling or breaking up into chips or fragments.

**3.** Kasler asserts that it did not receive this letter until sometime after August 31, 1985.

use and particulars of such aggregates. Monroc is in the business of providing the aggregates necessary to make concrete. It is undisputed that both parties hold themselves out as experts in their respective professions. Kasler and Monroc are merchants for UCC purposes.

■ Kasler also argues that the materials provided under the Agreements are not "goods" for purposes of the UCC. The Purchase Agreements obligated Monroc to supply aggregate subbase, crushed aggregate base, pcc and lcb aggregate, one inch concrete gravel, and concrete sand to Kasler for the purpose of mixing cement.[4] Agreements ¶ 2. Under the UCC, a sale of "goods" includes:

> a contract for the sale of minerals or the like ... to be removed from realty is a contract for the sale of goods within this chapter if they are to be severed by the seller....

*Id.* § 70A–2–107. The material supplied under the Agreements clearly fits within this definition. *See City of Salem v. Clearwater Construction Co.,* 84 Or.App. 674, 735 P.2d 373 (1987) (a contract for sand is a sale of goods governed by the UCC). A contract to provide sand, gravel and aggregate is a contract for the sale of goods. Kasler and Monroc are merchants who contracted for the sale of goods. Accordingly, this contract dispute is governed by the UCC.

## II. *BREACH OF CONTRACT AND WARRANTIES CLAIMS*

In its first cause of action, Kasler alleges that Monroc breached the Agreements by selling concrete aggregate which did not meet contract specifications. In its second cause of action, Kasler alleges breach of an express warranty by selling concrete aggregate which did not meet contract specifications, breach of warranty of future performance and breach of implied warranties because the material supplied was not merchantable and not fit for its intended purposes. Finally, in its eighth cause of action Kasler alleges breach of implied and express warranties as Salt Lake City's assignee.

## A. BREACH OF CONTRACT CLAIM

Kasler alleges in its first cause of action that the Purchase Agreements set forth certain specifications for concrete aggregate size and that Monroc delivered aggregate which did not conform with the specifications. Second Amended Complaint ¶ 12. Kasler argues that although it destroyed aggregates which it knew to be non-conforming, some out-of-specification aggregate was supplied by Monroc which Kasler mistakenly believed to be within the specifications and therefore did not reject. Kasler asserts that the spalling was caused because Kasler unknowingly incorporated this defective aggregate into the concrete which comprised the apron and taxiway and that it was unaware that Monroc supplied out-of-specification materials until sometime in 1991. Monroc counters that it did not provide out-of-specification aggregate, but that even if it did Kasler cannot now complain about it because Kasler knowingly accepted non-conforming goods.[5]

■ Kasler's breach of contract claim is barred because Kasler failed to reject and therefore accepted nonconforming goods.[6] The Utah Uniform Commercial Code allows a buyer to reject goods if the "goods or the tender of delivery fail in any respect to con-

---

**4.** For ease of discussion, the court will refer to the material supplied under the Agreements as "aggregate" unless otherwise specified.

**5.** Monroc also claims that this UCC action is barred by the statute of limitations. In this regard, Kasler argues that Utah's six year statute of limitations applicable to written contracts controls this dispute, while Monroc asserts that Utah's UCC four year statute, § 70A–2–725, controls. Kasler in turn challenges the constitutionality of § 70A–2–725. Resolution of the statute of limitations argument as to this claim is unnecessary in view of the court's ruling herein that

Kasler accepted nonconforming goods as a matter of law.

**6.** Notwithstanding Monroc's claim that the aggregate conformed to the contract specifications, for purposes of this analysis the court assumes without ruling that the material supplied by Monroc was nonconforming. Monroc would be entitled to judgment as a matter of law if the materials conformed, or if Kasler accepted *nonconforming goods. Hence, whether the goods actually conformed is not a material issue of fact which could preclude summary judgment on the breach of contract claim.

form to the contract." Utah Code Ann. § 70A–2–601. However, "acceptance of goods by the buyer precludes rejection of the goods accepted." *Id.* § 70A–2–607(2). The UCC defines acceptance of goods as occurring when the buyer:

(a) after a *reasonable opportunity to inspect* the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) *fails to make an effective rejection* ... but such acceptance does not occur until *the buyer has had a reasonable opportunity to inspect them;* or

(c) does any act inconsistent with the seller's ownership....

*Id.* § 70A–2–606 (emphasis added).

■■■ Actual knowledge of the nonconformity is not an element or a factor in determining whether a buyer has accepted nonconforming goods under the statute. Goods are accepted under the statute if not rejected after the buyer has had a *"reasonable opportunity to inspect* the goods." *Id.* (Emphasis added). Moreover, an effective rejection of goods "must be *within a reasonable time* after their delivery or tender...." *Id.* § 70A–2–602(1) (emphasis added). Thus, it is apparent that constructive as well as actual knowledge can be determinative of acceptance. Constructive knowledge is imputed when a buyer has a reasonable opportunity to inspect and reasonable time to reject the goods.

It is undisputed that Kasler not only had a reasonable opportunity to inspect the aggregate, but actually inspected it on a regular basis. Although Kasler did not test the aggregate on site, the material was tested at Chen & Associates' laboratory in Salt Lake City and Chen was directed to inform Kasler of any material quality problems. In addition, Kasler tested the concrete and disposed of concrete which did not meet the specifications, thus providing a second level of inspection of the materials supplied by Monroc.[7]

Kasler did not reject the aggregate now claimed to be defective and which Kasler claims caused the spalling in the apron and taxiway within a reasonable time after delivery. The record before the court reveals that at the very earliest, Kasler notified Monroc of a desire to "reject" the aggregate in 1990 when Kasler notified Monroc by letter of Salt Lake City's claim against Kasler. Moreover, Kasler incorporated the aggregate which was not rejected into concrete that was used for the taxiway and apron. Incorporating the aggregate into the concrete was an act inconsistent with Monroc's ownership of the aggregate. Because Kasler failed to reject the goods and acted inconsistently with Monroc's ownership of the goods, Kasler, by definition, accepted the aggregate.

■■ A buyer who accepts goods can revoke such acceptance under some circumstances. Section 70A–2–608 allows revocation of an acceptance if the "nonconformity substantially impairs its value" and if the buyer accepted it on the reasonable assumption that the nonconformity would be cured or if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. Utah Code Ann. § 70A–2–608(1). However, subsection 2 of § 70A–2–608 provides:

Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects....

*Id.* § 70A–2–608(2).

Kasler's acceptance was not induced by difficulty of discovery. To the contrary, Kasler was provided a reasonable opportunity to inspect the aggregate and did inspect the aggregate. Under these circumstances, Kasler should have discovered and timely rejected the out-of-specification materials before they were substantially changed.

The court finds that Kasler had a reasonable opportunity to inspect the materials supplied by Monroc and failed to make an effec-

---

7. Kasler's Memorandum in Opposition to Summary Judgment, Statement of Facts at 6. Kasler rejected "sizeable quantities" of material that it knew was not within specifications. *Id.* at 8

(quoting Mr. Calo's deposition). Also, Kasler representatives occasionally visited the Monroc site and obtained samples for testing. *Id.* at 7.

tive rejection thereof. By substantially changing the condition of the aggregate, incorporating it into the concrete apron and taxiway, Kasler acted inconsistently with Monroc's ownership of the aggregate. Kasler accepted non-conforming goods under these circumstances and cannot now revoke that acceptance. Accordingly, Monroc's motion for summary judgment is granted on the first cause of action.

## B. EXPRESS AND IMPLIED WARRANTIES CLAIMS

Kasler alleges, in its second cause of action, that Monroc breached express and implied warranties of merchantability and of fitness. Second Amended Complaint ¶ 15. In Kasler's eighth cause of action, it realleges breach of express and implied warranties as an assignee of Salt Lake City. *Id.* ¶ 41. Kasler also claims Monroc breached a warranty of future performance, and that Kasler was unaware of Monroc's breach of warranty until the spring of 1991.[8]

1. *Kasler's action for breach of express and implied warranties is barred for failure to give timely notice.*

The purchase agreements unambiguously warrant the materials supplied. The purchase agreements provide:

5) All materials furnished under this agreement shall be first-class in every respect, shall be satisfactory to the Buyer and shall conform strictly with the drawings and specifications and all modifications thereof on file ... In the case of materials ordered by sample the materials furnished shall also be equal in every way to the sample submitted.

\*   \*   \*   \*   \*   \*

11) The Seller [Monroc] warrants and guarantees the materials covered by the agreement and agrees to make good at his own expense any defect in such materials

which may occur or develop prior to the Buyer's [Kasler's] release from responsibility therefor.

Purchase Agreement # 212–03, ¶¶ 5, 11; Purchase Agreement # 211–03, ¶¶ 5, 11 ("Agreements").

The UCC defines an express warranty as "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." Utah Code Ann. § 70A–2–313(1)(a). Such an affirmation creates an express warranty that the "goods shall conform to the affirmation or promise." *Id.* Moreover, "any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample ..." *Id.* § 70A–2–313(1)(c). In this case Monroc expressly warranted that the material supplied would conform with the contract specifications.

Section 70A–2–314 provides that a "warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Id.* § 70A–2–314. In this case, implied warranties of merchantability and fitness exist in the Agreements between Kasler and Monroc.

Kasler argues that Monroc breached the express warranty that the aggregate would conform to the contract specifications as well as the implied warranties. However, as we have already seen, Kasler accepted the aggregate tendered by Monroc. Kasler should have discovered any breach by Monroc when Kasler inspected or had the opportunity to inspect the aggregate, or when Kasler tested the concrete.

A buyer's ability to recover damages for a seller's breach, when the goods have been accepted, is limited by the notification requirements of § 70A–2–607(3). Utah Code Ann. § 70A–2–714. Section 70A–2–607(3)

---

8. The UCC statutory period for breach of warranty claims is four years. Utah Code Ann. § 70A–2–725(1) (1990). Under the statute, the cause of action for a breach of warranty typically accrues when tender of delivery is made. However, "where a warranty explicitly extends to the future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." *Id.* § 70A–2–725(2). Kasler has challenged the constitutionality of this statute, but resolution of the constitutional issue is not necessary for purposes of this Memorandum Decision and Order.

provides that when a tender of delivery has been accepted, a "buyer must *within a reasonable time* after he discovers or *should have discovered* any breach notify the seller of breach or be barred from any remedy." *Id.* § 70A–2–607(3)(a) (emphasis added). Notification to Monroc that it possibly breached the warranties six years after tender of delivery and after Kasler should have discovered the breach is not, as a matter of law, "within a reasonable time." *See Chrysler Credit Corp. v. Burns,* 527 P.2d 655 (Utah 1974) (court rejected buyer's claim that seller breached implied warranty of fitness because buyer had accepted and kept the goods for a period of two years without rejecting the goods or attempting to rescind the contract). Kasler is now barred from any remedy for Monroc's alleged breach of express or implied warranty.

### 2. *The alleged warranty of future performance does not qualify as such but may constitute an agreement to indemnify.*

Kasler argues that Monroc warranted the future performance of the concrete, as the final product, and that any statute of limitations claimed to be applicable would not begin to run until Kasler learned of the breach. Kasler relies upon the following contractual provision:

> The Seller [Monroc] warrants and guarantees the materials covered by the agreement and agrees to make good at his own expense any defect in such materials which may occur or develop prior to the Buyer's [Kasler's] release from responsibility therefor.

Agreements ¶ 11. Monroc counters that it did not warrant the future performance of the materials supplied, but that in any event the warranty extends only to such materials before they are mixed into concrete.

If the warranty constitutes a warranty of future performance, Kasler would be able to take advantage of the discovery rule exception in the UCC statute of limitations for breach of warranty:

> where a warranty explicitly extends to the future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Utah Code Ann. § 70A–2–725(2).

To fall within the future performance exception, "a warranty must explicitly promise or guarantee future performance of the goods; it must be clear, unambiguous and unequivocal." *Crouch v. General Elec. Co.,* 699 F.Supp. 585, 594 (S.D.Miss.1988) (citations omitted). The overwhelming majority of courts that have interpreted this section "have been very harsh in determining whether a warranty explicitly extends to future performance." *H. Sand & Co., Inc. v. Airtemp Corp.,* 738 F.Supp. 760, 770 (S.D.N.Y. 1990) (quoting *Standard Alliance v. Black Clawson Co.,* 587 F.2d 813, 820 (6th Cir. 1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979)). *See also* J. White and R. Summers, 1 *Uniform Commercial Code* § 11–9, 551 (3d ed. 1988) ("extension of the normal warranty period does not occur in the usual case, even though all warranties in a sense apply to future performance of goods.") Emphasizing the term "explicit," courts seldom find that an express warranty can meet the test.[9] *H. Sand & Co.,* 738 F.Supp. at 771 (warranty language in which "Seller agrees to replace … said material and equipment, or remedy any defects … which [ ] may develop within one year" and the "obligation under this warranty is limited solely to repairing or replacing parts" held not to constitute warranties of future performance).

Some courts have noted examples of language that does create a warranty of future performance, such as a representation that the goods "will satisfactorily perform at all times," "will work properly for a lifetime," or "will give satisfactory service at all times." *Crouch,* 699 F.Supp. at 594; *Owens v. Patent*

---

9. The District Court of the District of Delaware explained that the drafters of the UCC chose to "reserve[] the benefits of an extended warranty to those who *explicitly* bargain for them" because the policy behind the UCC statute of limitations of providing to sellers a well defined period of liability out-weighed the buyer's interest in obtaining an extended warranty. *Raymond–Dravo–Langenfelder v. Microdot, Inc.,* 425 F.Supp. 614, 619 (D.Del.1977) (emphasis added).

*Scaffolding, Co.,* 77 Misc.2d 992, 354 N.Y.S.2d 778, 784 (1974), *rev'd on other grounds,* 50 A.D.2d 866, 376 N.Y.S.2d 948 (1975) (citations omitted).

■ In the case at bar, the court finds no warranty of future performance set forth in ¶ 11 of the Agreements. Monroc agreed that it would "make good" any defect which "may occur" before Kasler is released from responsibility. This does not constitute a promise that the aggregate will not become defective at some future point in time. The language in question is not an unambiguous and unequivocal warranty of the future performance of the *materials* supplied. It is more akin to a warranty to repair or replace, rather than a warranty of future performance. "The key distinction between these two kinds of warranties is that a repair or replacement warranty merely provides a remedy if the product becomes defective, while a warranty for future performance *guarantees the performance of the product itself* for a stated period of time." *Ontario Hydro v. Zallea Systems, Inc.,* 569 F.Supp. 1261, 1266 (D.Del. 1983) (emphasis in original). The promise contained in ¶ 11 of the Agreements relates to *Monroc's obligation* to "make good" on any defect, rather than the quality or the performance of the aggregate. *See Voth v. Chrysler Motor Corp.,* 218 Kan. 644, 545 P.2d 371, 374–75 (1976) (warranty against defects in vehicle for 12 months or 12,000 miles, and that any part of the vehicle found defective would be repaired or replaced, was a warranty that the manufacturer would repair or replace defective parts, it was not a warranty that the vehicle would perform without malfunction during the term of the warranty.)

This court rules that the promise contained in ¶ 11 of the Agreements does not constitute a warranty for the future performance. Rather, it amounts to an undertaking by Monroc to indemnify or hold harmless Kasler on account of defects which may occur prior to the time that Kasler is released from liability by Salt Lake City.[10] Accordingly, Monroc's motion for summary judgment on the second and eighth[11] causes of action is granted.[12]

### III. *KASLER'S TORT CLAIMS*

Kasler's fourth, sixth, seventh and third causes of action allege negligence, negligent misrepresentation, product liability and strict liability. Kasler's ninth, tenth and twelfth causes of action re-assert the negligence, product liability and strict liability claims derivatively as an assignee of Salt Lake City.

### A. NEGLIGENCE

#### 1. *Kasler's direct negligence claim.*

Kasler's fourth cause of action alleges that Monroc owed Kasler a "duty to exercise reasonable care under the circumstances to manufacture and provide Kasler with aggregate which met project specifications and which was suitable for use in the Projects," and that Monroc breached this duty by "manufacturing and selling ... aggregate which did not meet project specifications ..." Second Amended Complaint, ¶¶ 21 & 22.

■ The relationship between Kasler and Monroc is solely a contractual relationship. Utah does not recognize tort actions for a breach of contract. *Brigham Young University v. Paulsen Construction,* 744 P.2d 1370 (Utah 1987). In *Brigham Young,* Brigham Young University undertook the construction of a new building. Since the pipes began to leak shortly after completion of the building, the University brought an action against the general contractors alleging that the contractors negligently failed to supervise installation of the pipe insulation material which did not conform to the project specifications. *Id.* at 1371. The Utah Supreme Court rejected this theory, stating "[a] negligent failure to perform contractual duties is a breach of

---

10. Kasler's claimed right to indemnification is discussed at Section IV.B., *infra.*

11. To the extent that Kasler's eighth cause of action sets forth a claim for breach of warranty as a tort concept, it is subsumed by the court's analysis and ruling with respect to the strict liability claims, *infra.*

12. Because of the ruling of the court, there is no need to address the statute of limitation issues raised by Kasler.

contract, not a tort." *Id.* at 1372 n. 2.[13] The Utah Supreme Court reasoned that the University's action sounded in contract rather than tort because, absent the contractual obligations between the parties, the contractors had no obligation to the University. *Id.* at 1372.

The Utah Supreme Court has recognized tort actions in contractual relationships in those situations where the parties' actions rise to the level of tortious conduct. *See DCR Inc. v. Peak Alarm Co.,* 663 P.2d 433, 437 (Utah 1983) (tort action and contract action may both lie because the tort cause of action was "entirely separate from any contract-based claims"); *Leigh Furniture and Carpet Co. v. Isom,* 657 P.2d 293, 310 (Utah 1982) ("because the law remedies breaches of contract with damages calculated to give the aggrieved party the benefit of the bargain, there is no need for an additional remedy in tort unless the defendant's conduct would constitute a tort independent of the contract").

■ In the case at bar, Kasler does not allege that Monroc's actions rise to an independent tort. Moreover, this court rules as a matter of law that Monroc's actions do not rise to the level of tortious conduct. Kasler cannot convert this contract action into one in tort by alleging that Monroc negligently breached the contract. Accordingly, summary judgment with respect to Kasler's fourth cause of action is granted.

### 2. *Kasler's derivative negligence claim.*

Kasler's ninth cause of action alleges that Monroc owed Salt Lake City a "duty to exercise reasonable care under the circumstances to manufacture and provide Kasler with aggregate which met project specifications and which was suitable for use in the Projects," and that Monroc breached this duty by "selling Kasler . . . aggregate which did not meet project specifications and which was unsuitable for use in the Projects. . . ." Second Amended Complaint, ¶¶ 44 & 45.

■ Generally, no recovery on a negligence claim is allowed for purely economic losses. *Diatom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1580 (10th Cir.1984). However, when damage to the property results, the analysis is removed from consideration of "purely economic" losses. *W.R.H., Inc. v. Economy Builders Supply,* 633 P.2d 42, 44 (Utah 1981). Since Salt Lake City suffered property damage by virtue of the deteriorating apron and taxiway, Kasler urges this court to recognize its negligence claim against Monroc as Salt Lake City's assignee.

In *W.R.H.,*[14] the Utah Supreme Court determined that "[w]here some damage to the product results from the negligence of the manufacturer, the consumer's damages are not 'purely economic,' . . . and actions to recover all damages resulting from the product's deterioration should be allowed under a negligence theory." *Id.* At first blush, the rationale of the *W.R.H.* case seems to control the case at bar. However, in *Paul Mueller Co. v. Cache Valley Dairy Ass'n,* 657 P.2d 1279, 1286 (Utah 1982), the Utah Supreme Court strictly limited the holding in *W.R.H.* to its particular facts. In *Paul Mueller,* the supreme court held that the manufacturer had no duty to guard against economic loss of its purchasers. *Id.* at 1286. The court recognized that *W.R.H.* created such a duty where the product was "destined for retail sale to unknown and potentially inexperienced purchasers" and the defect was concealed. *Id.* That case was distinguished on the grounds that in *Paul Mueller* the manufacturers provided their products and services to a presumably knowledgeable contractor

---

**13.** The specific issue addressed in *Brigham Young* was whether the statute of limitations for written contracts or for injury to property should apply. The Supreme Court refused to apply the three-year statute of limitations for injury to property. In so doing, the court distinguished those cases which had applied the statute for injury to property on the ground that each of the cases involved *tortious* injury to property as opposed to injury caused by a breach of contract. *Brigham Young,* 744 P.2d at 1372–73 (citing

*Holm v. B & M Service, Inc.,* 661 P.2d 951 (Utah 1983); *Utah Poultry & Farmers Cooperative v. Utah Ice & Storage Co.,* 187 F.2d 652 (10th Cir.1951)).

**14.** *W.R.H.* involved defective plywood siding which delaminated over time. The purchaser of the siding brought an action alleging the negligent manufacture of the siding. Summary judgment in favor of the manufacturer was reversed.

in accordance with detailed contract specifications, the alleged defects were not concealed and the manufacturers were in no better position to anticipate the possible economic consequences of the defect than the purchaser. *Id.*

The case at bar is factually aligned with *Mueller.* First, Monroc contracted with Kasler, undisputedly a knowledgeable contractor, and Monroc was to perform pursuant to detailed contract specifications. Second, there is no evidence that Monroc attempted to conceal any alleged defect. The size of the aggregates could not have been concealed. Kasler could ascertain the size of the aggregates at any time and in fact the aggregate supplied by Monroc was consistently subjected to sieve analyses. And third, Monroc was in no better (and quite possibly worse) position than Kasler to anticipate potential economic losses if the sand were defective. Moreover, because Monroc contracted directly with Kasler and Kasler closely supervised the entire operation, Monroc reasonably could have believed that if any defect occurred, Kasler would notify Monroc and attempt to remedy any such defect. Consequently, like the ultimate consumer in *Paul Mueller,* Salt Lake City would be barred from seeking economic losses from Monroc. Since Monroc would be insulated from a claim by Salt Lake City that Monroc breached a duty of care, Monroc likewise would be insulated from Kasler's derivative action as Salt Lake City's assignee.

Based upon the foregoing, summary judgment is granted on the ninth cause of action.

## B. NEGLIGENT MISREPRESENTATION

Kasler's sixth cause of action alleges negligent misrepresentation of the quality of aggregate that would be supplied and that Monroc would comply with contract specifications. Second Amended Complaint, ¶ 31. The negligent misrepresentation claim cannot lie in an action stemming solely from promises in a contract. In the absence of an independent tort, a tort cause of action will not lie for breach of contract. Any pre-contractual representations made by Monroc were subsumed by the contract. Hence,

summary judgment with respect to the sixth cause of action is granted.

## C. PRODUCT LIABILITY

Kasler's seventh and tenth causes of action allege, on its own behalf and as assignee of Salt Lake City, that "Monroc sold Kasler aggregate which was defective ... or in a defective condition ... The aggregate ... was 'unreasonably dangerous' ... [and] caused property damage...." Second Amended Complaint ¶¶ 36–38, 50–52. The analysis is the same for the direct and the derivative actions.

The touchstone for a products liability claim is that there must be a "defect or defective condition in the product which made the product unreasonably dangerous to the user or consumer." Utah Code Ann. § 78–15–6 (1992). The Utah legislature has defined "unreasonably dangerous" as follows:

"Unreasonably dangerous" means that the product was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer or user of that product in that community considering the product's characteristics, propensities, risks, dangers and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user or consumer.

Utah Code Ann. § 78–15–6. In *Diatom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1581 (10th Cir.1984), the Tenth Circuit ruled, consistently with the aforesaid Utah legislative definition, that "unreasonable dangerousness consistently appears as a prerequisite and touchstone to recovery in tort for damages caused by a defective product."

In opposition to summary judgment, Kasler points to the decision of *Ernest W. Hahn, Inc. v. Armco Steel Co.,* 601 P.2d 152 (Utah 1979). In *Hahn,* the Utah Supreme Court recognized an action for products liability for defectively manufactured joists and defective welds which caused the roof of the Fashion Place Mall to collapse. *Id.* at 158. However, *Hahn* does not control the case at bar. In that case, the manufacturer sold its products in a defective condition which created an unreasonably dangerous situation. *Id.* The

defective condition was concealed by painting over the welds so that there was no reliable way of testing the reliability of the welds. *Id.* Unlike the facts set forth in *Hahn,* the situation between Kasler and Monroc does not rise to a products liability suit. The size of the aggregate provided by Monroc was not concealed.

■ This court rules as a matter of law that the material provided by Monroc is not an unreasonably dangerous product. There is no evidence before the court that concrete aggregate is "dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer." Kasler is a general contractor in the business of making concrete. As such, Kasler is charged with being aware of the problems which could arise if the concrete is mixed with aggregate of the wrong size.[15] In light of Kasler's knowledge, training, and experience, concrete certainly cannot be said to be "unreasonably dangerous". Accordingly, summary judgment is granted with respect to the seventh and tenth causes of action.

### D. STRICT LIABILITY

Kasler's third cause of action alleges that Monroc breached its implied warranties and should be held strictly liable for selling defective products which proximately caused the concrete deterioration. Second Amended Complaint, ¶ 18. Kasler's twelfth cause of action alleges breach of implied warranties as an assignee of Salt Lake City.

■ Under both causes of action, Kasler seeks to have Monroc held "strictly liable" for breaching its "implied warranties" by supplying "defective" goods which "proximately caused" Kasler's injury. These causes of action denote a tort-type claim for relief. Under Utah law, the analysis applied to a warranty claim is determined by "the nature of the action and not the pleading

labels chosen." *Davidson Lumber v. Bonneville Inv.,* 794 P.2d 11, 14 (Utah 1990) (clear distinction between implied warranties for contract purposes and implied warranties in the tort sense). The term "warranty" as used in tort law is synonymous with strict liability. *Id.* at 14.[16]

■ Under Utah law, the elements of breach of an implied warranty and products liability are essentially the same. *Ernest W. Hahn, Inc., v. Armco Steel Co.,* 601 P.2d 152, 159 (Utah 1979). *See also Grundberg v. Upjohn Co.,* 813 P.2d 89, 91–92 (Utah 1991) (strict liability claim analyzed under Section 402A of the Restatement (Second) of Torts (1965) which was the predecessor of Utah's Product's Liability Act); *Berry By and Through Berry v. Beech Aircraft,* 717 P.2d 670, 672 (Utah 1985) (plaintiff's claims of strict liability and breach of warranty were analyzed under Utah's Product Liability law). Kasler's strict liability claims are controlled by, and indistinguishable from, the products liability claim.

This court has already determined that Monroc's actions do not constitute independent torts nor can they be the grounds for a products liability cause of action. Accordingly, Kasler's strict liability claims cannot lie and summary judgment with respect to the third and twelfth causes of action is granted.

### IV. *INDEMNITY AND CONTRIBUTION CLAIMS*

Kasler's fifth cause of action is a direct action for indemnification and contribution. Second Amended Complaint, ¶ 28. In the eleventh cause of action, Kasler seeks indemnity and contribution as Salt Lake City's assignee. *Id.* ¶ 56.

### A. CONTRIBUTION CLAIMS [17]

■ Kasler's claims for contribution fail because this controversy lies strictly in

---

**15.** The only allegation that the aggregate was defective is based on the fact that it did not meet the contract specifications—it was allegedly the wrong size.

**16.** To the extent that Kasler's eighth cause of action, in which breach of warranty as Salt Lake City's assignee is alleged, sets forth a claim for

breach of warranty as a tort concept, it is subsumed by the court's analysis and decision with respect to the strict liability claims.

**17.** This section also addresses Monroc's separate motion for summary judgment on Kasler's contribution claim.

contract rather than tort. The right of contribution "grows out of the existence of liability for [a] tort". *Unigard Ins. Co. v. City of LaVerkin,* 689 P.2d 1344, 1346 (Utah 1984). Common law contribution was designed "to rectify the inequity resulting when one tortfeasor pays more than his share of common liability." *Id.* Since the basic premise underlying Kasler's contribution action is that a tort has been committed, Monroc's motion for summary judgment is granted with respect to the contribution aspects of the fifth and eleventh causes of action.

## B. INDEMNIFICATION

In paragraph 11 of the Agreements, Monroc agreed to "make good at his own expense any defect in such materials which may occur or develop prior to the Buyer's [Kasler's] release from responsibility therefor." Agreements ¶ 11. Kasler seeks indemnification [18] from Monroc for $1.5 million, the amount of its settlement with Salt Lake City. Monroc argues that Kasler's alleged right of indemnification is barred by the UCC four year statute of limitations.[19]

■ Although the indemnification action arises from the contract, the cause of action could only arise after Kasler settled Salt Lake City's claims and was released from liability in 1991. Kasler's alleged right is based upon Monroc's promise to "make good" on defects, and under the parties' agreement that obligation could not be triggered until Kasler was released from liability. It follows that the four year statutory period, or whatever statutory period is deemed applicable, would run from the date that Kasler settled with Salt Lake City. Accordingly, the court rejects the claim that the indemnification action is barred by any statute of limitations.

■ Although it is clear to the court that Monroc promised to indemnify Kasler, the nature and scope of the promise to indemnify is unclear. The court cannot determine from the four corners of the Agreements specifically what the parties intended. The court deems the language in question to be ambiguous, thus requiring the receipt of parol evidence as to the intention of the parties. Kasler has maintained in this litigation that the aggregate did not conform to the contract specifications at the time of delivery. But could the materials as such have become defective after delivery—before or after being mixed to create concrete? In this regard, was Monroc's promise to "make good ... any defect" which may occur restricted only to defects in the aggregate materials supplied? Or was it the intent of the parties that Monroc hold Kasler harmless from defects which might develop, such as spalling in the concrete caused by the mixing of defective materials supplied by Monroc? The answer to these and other questions bearing upon the nature and scope of the indemnity language present issues of fact which cannot be determined on summary judgment. Accordingly, summary judgment is denied with respect to the indemnification claims set forth in Kasler's fifth cause of action.

## C. DERIVATIVE INDEMNIFICATION ACTION

■ In its eleventh cause of action, Kasler states a claim for indemnification as Salt Lake City's assignee. The eleventh cause of action is nothing more than a statement of a different calculation of damages for the alleged breach of contract and breach of warranty. Kasler states that: "SLC paid or will pay consultants and contractors to inspect the concrete deterioration on the apron and taxiway, to develop repair methods, to repair test areas of deteriorated concrete, to evaluate the repairs, to recommend repair procedures, and to repair the concourse and taxiway." Second Amended Complaint ¶ 55. The damages for which Kasler seeks indemnification are consequential damages which require estimation. The best estimate of the damages that Salt Lake City has suffered or

---

**18.** An agreement to indemnify is a promise to "make good" for loss or damages incurred. 42 C.J.S. Indemnity § 1 (1991).

**19.** In Utah, an indemnification action based on a UCC contract is governed by the limitations period for the underlying contract. *Perry v. Pioneer Wholesale Supply Co.,* 681 P.2d 214, 218 (Utah 1984). The statutory period under the UCC is four years. Utah Code Ann. § 70A–2–725.

will suffer is the amount for which Salt Lake City settled, $1.5 million. To allow Kasler, while standing in the shoes of Salt Lake City, to claim damages in an amount above and beyond what Salt Lake City estimated its damages would be and in fact accepted in full settlement, would result in a windfall to Kasler. Moreover, this derivative action is nothing more than a restatement of Kasler's direct action for indemnification. Accordingly, summary judgment on the eleventh cause of action is granted.

Based upon the foregoing, it is hereby

ORDERED, that Monroc's motion for summary judgment is GRANTED with respect to the first, second, third, fourth, sixth, seventh, eighth, ninth, tenth, eleventh and twelfth causes of action; it is

FURTHER ORDERED, that Monroc's motion for summary judgment is GRANTED with respect to the contribution aspect of the fifth cause of action; it is

FURTHER ORDERED, that Monroc's motion for summary judgment is DENIED with respect to the indemnification aspect of the fifth cause of action.

IT IS SO ORDERED.